WO                                                                                                          SKC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Michael Martin Sanders,

                        Plaintiff,

v.

Trinity Services Group Incorporated, et al.,

                        Defendants.

No.   CV 18-01471-PHX-JAT (DMF)

**ORDER**

Plaintiff Michael Martin Sanders, who is currently confined in the Arizona State Prison Complex (ASPC)-Lewis, brought this civil rights action pursuant to 42 U.S.C. § 1983.  Before the Court are the following Motions: (1) a Motion for Summary Judgment filed by Defendants former Arizona Department of Corrections, Rehabilitation & Reentry (ADCRR) Director Charles L. Ryan and ASPC-Lewis Warden Chris Moody (Doc. 100), and (2) a Motion for Summary Judgment filed by Defendants Trinity Services Group Incorporated ("Trinity") and current ADCRR Director David Shinn (Doc. 95).

Plaintiff was informed of his rights and obligations to respond to both Motions for Summary Judgment pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 98, 102), and he failed to respond in a timely manner.  Thereafter, Magistrate Judge Fine granted two Motions of Plaintiff, seeking extensions of time to respond, but Plaintiff also failed to meet the extended deadlines.  (*See* Doc. 124.)   The Court subsequently denied Plaintiff's appeal of Judge Fine's November 2, 2020 Order setting a final, extended deadline for Plaintiff's responses; struck Plaintiff's late-filed Responses

and Statements of Fact and Defendants' reply briefs; and directed that the Motions for Summary Judgment be considered unopposed.  (*Id.*)[1]

The Court will now grant both Motions for Summary Judgment.

## I.   Background

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims in Count One against Trinity and Ryan in his official capacity based on the alleged nutritional inadequacy of Trinity's standard adult male diet provided to ADCRR prisoners.  (Doc. 9.)  The Court also found that Plaintiff stated Eighth Amendment claims in Counts Two and Three against Ryan and Moody in their individual and official capacities based on ADCRR's blanket mechanical restraint policy.  (*Id.*)  The Court dismissed the remaining claims and Defendants.  (*Id.*)  The Court subsequently substituted current ADCRR Director Shinn for former Director Ryan in his official capacity only, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  (Doc. 73.)

Plaintiff seeks declaratory and injunctive relief and damages.  (Doc. 1 at 20.)

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

---

[1] The Court has since denied Plaintiff's Motion for Reconsideration of that Order. (Doc. 127.)

1   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable
2   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
3   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th
4   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its
5   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,
6   it must "come forward with specific facts showing that there is a genuine issue for trial."
7   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal
8   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

9        At summary judgment, the judge's function is not to weigh the evidence and
10  determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,
11  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw
12  all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited
13  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

14  **III.    Facts**[2]

15       Plaintiff has been incarcerated within ADCRR since August 1999 and is currently
16  serving a life sentence for first-degree murder, has a future life sentence for first-degree
17  murder, and has four other future sentences ranging from 15 to 24 years for two counts
18  each of aggravated assault and first-degree burglary.  (Doc. 101 (Ryan and Moody's
19  Statement of Facts) ¶¶ 1−2.)  Plaintiff was initially classified as maximum custody, but his
20  custody level has twice been reduced, in 2001 and 2003, first to close custody, then to
21  medium custody, and it cannot be further reduced.  (*Id.* ¶ 4.)

22  . . . .

23  . . . .

---

25       [2] Because the Court has stricken Plaintiff's Responses and Statements of Fact, it
26  will consider Defendants' properly supported facts undisputed, except where those facts
    are clearly contradicted by Plaintiff's first-hand allegations in the verified Complaint or by
27  other evidence on the record.  Where the nonmovant is a pro se litigant, the Court must
28  consider as evidence in opposition to summary judgment all the nonmovant's contentions
    set forth in a verified complaint.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

### A.      ADCRR's Mechanical Restraint Policy

Department Order (DO) 705, *Inmate Transportation*, establishes the requirements and guidelines for the transportation of ADCRR prisoners.  (Doc. 101 ¶ 17.)  As part of their pre-service 7-week Correctional Officer Training Academy (COTA), ADCRR Correctional Officers (COs) receive a seven-hour course called *Transportation and Restraints 6.2*, which covers restraint requirements for each custody level, the different types of restraints used, and how and when these restraints are used.  (*Id.* ¶¶ 14−17; Doc. 101-1, Ex. E (Montano Decl.) ¶¶ 3−6.)  "Transportation" is defined in this context as the "moving of inmates outside the confines of an [ADCRR] institution," and includes hospital appointments.  (Doc. 101-1 at 82.)  COTA Cadets are instructed that DO 705 "dictates how and under what circumstances" they will be required to transport prisoners and that all transports "are to be completed using the appropriate security and safety measures."  (*Id.*)

DO 705.10 § 1.1.1.1 states that, "Full-Restraints shall always be used when transporting any medium, close or maximum custody inmate."  (Doc. 101-1 at 125.)  Full Restraints consist of "the application of a belly-chain, handcuffs and leg-irons."  (*Id.* at 134.)

DO 705.10 § 1.6, *Medically Necessary Modified Restraint Method*, provides that "[d]ocumented objective medical findings shall have a medical special needs order recommending 'modified restraint methods'" and that

> [t]he medical provider, with consultation from the Warden, shall issue a medical special needs order when it is determined restraint modification is necessary for non-obvious medical reasons and shall inform the security staff of the nature of the modified restraint option necessitated by the physical need.

(*Id.* at 131 (DO 705.10 §§ 1.6.1 & 1.6.2).)

In a hospital setting, when restraint removal is deemed necessary, medical staff must fax a Request for Removal of Restraints form to the Deputy Warden of Operations and/or Warden of the Complex where the prisoner was housed prior to hospitalization, and the

Warden or Deputy Warden must provide written approval.  (*Id.*)  When a request for modification of restraints is received from a hospital, the decision whether to keep the prisoner in full restraints is based on the prisoner's custody level, history of assault behavior, and escape history.  (Moody Decl. ¶ 11.)

### B. Plaintiff's Hip Surgery

On January 18, 2016, Plaintiff underwent a successful right hip replacement surgery at Banner Baywood Medical Center ("Banner Baywood") to address his degenerative joint disease and ongoing hip pain.  (*Id.* ¶ 26; Doc. 1 ¶ 20.)  Plaintiff was transported to Banner Baywood in full four-point mechanical restraints, consisting of leg shackles, a belly chain, and handcuffs.  (Doc. 101 ¶ 27; Doc. 1 ¶ 21.)

Prior to his hospitalization, Plaintiff had never requested a modification of restraints for his custody level, and he did not have any special needs orders limiting how he was to be restrained.  (*Id.* ¶ 30.)  Upon arrival to the hospital, he was taken to pre-op, and his hands were uncuffed, one hand at a time, for him to wash with wipes.  (Doc. 101 ¶¶ 32−33.)

Plaintiff was not restrained during surgery, but hospital records indicate the hospital had orders to continue daily restraints.  (*Id.* ¶ 36; Doc. 101-1 at 163.)[3]  Following surgery, Plaintiff was taken to the recovery room, and he was later brought to a private room, where he remained for 4 days, until January 21, 2016, when he was released back to ADCRR. (Doc. 101 ¶ 35; Doc. 1 ¶ 26.)  During this time, Plaintiff was also guarded by rotating teams of two correctional officers (COs) II each, serving 8-hour shifts, and he never had the same team or individual CO II twice.  (Doc. 1 ¶ 21.)

While in the hospital, Plaintiff repeatedly experienced lengthy, painful bouts of muscle cramping, which he attributes in part to his allegedly diminished nutritional state from his prison diet, and in part to having his arms and legs mechanically restrained.  (*Id.* ¶ 23.)  Due to his restraints, Plaintiff was unable to engage in necessary body movements

---

[3] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

to counteract or alleviate the cramping, which he states was obvious to anyone present, including the CO IIs who were in his room.  (*Id.*)

On the second day of Plaintiff's hospital stay, Plaintiff asked the CO IIs guarding him to modify his four-point restraints to one or two points to alleviate the frequency and duration of the muscle cramping, but every CO II team so requested declined to do so, citing ADCRR's blanket four-point mechanical restraint policy for hospitalized prisoners. (*Id.* ¶ 24.)  Hospital staff made the same requests of the CO IIs, but every shift of CO IIs also refused the requests of hospital staff based on ADCRR's blanket mechanical restraint policy.  (*Id.*)  The four-point restraints interfered with Plaintiff's eating, drinking, getting on and off the toilet, and his physical therapy sessions, and he could only sleep for short periods of time due to the discomfort and severe restriction on his bodily movements.  (*Id.* ¶ 25.)

Plaintiff first complained about the restraints when he was given his first meal after surgery.  (Doc. 101-1, Ex. B (Pl.'s Dep.) at 27:10−21.)  He asked if the CO IIs could "turn a hand loose" for him to be able to eat, but they said, "no," so he did the best he could, and he was able to eat his meal.  (*Id.*)  From the second to fourth day of his hospital stay, Plaintiff ate four to five hospital meals per day, plus snacks in between meals.  (Doc. 1 ¶ 20.)  Nursing notes indicate that, on January 20, 2016, nursing staff regularly evaluated Plaintiff's restraints for any evidence of ill-effect or injury, and found none; Plaintiff received assistance getting from a chair to the bathroom and into bed with "no issues"; he received medications, and his blood was taken and vitals checked; he was also taken to and from his room for physical therapy; and he received a sponge bath, all without issues. (Doc. 101-1 at 244−246.)

Registered Nurse (RN) David Doench, one of the nurses assigned to Plaintiff after his hip surgery, attests that Plaintiff's restraints were regularly checked by nursing staff. (Doc. 101-1, Ex. I (Doench Decl.) ¶¶ 3, 4.)  On January 21, 2016, RN Doench personally checked Plaintiff's restraints at 7:56 a.m., 10:00 a.m., noon, 2:00 p.m., 4:00 p.m., and 6:00 p.m. and found they were properly applied with no evidence of any adverse effects or

injury.  (*Id.* ¶ 4.)  During these checks, Plaintiff's restraints were also adjusted to prevent any skin breakdown, and his restrained extremities were checked for proper pulse, capillary re-fill (blood flow), and warmth.  (*Id.* ¶ 5.)  Hospital staff reposition restrained patients at mealtimes, and such patients usually hike up their belly chains to accommodate eating.  (*Id.* ¶ 6.)  According to RN Doench, Plaintiff was able to eat, drink, and use the bathroom, and his hygiene needs, such as bed baths, and teeth brushing were also met.  (*Id.* ¶ 7.)

Nursing staff noted during the following night-time checks that Plaintiff was sleeping: on January 18, 2016, at 21:21, 21:50, 23:54, and 23:59; on January 19, 2016, at 03:00 and 05:00; and on January 20, 2016, at midnight, 02:00, and 07:56.  (Doc. 101 ¶ 48.)

Starting on January 19, 2016, Plaintiff had two physical therapy sessions a day for the duration of his stay.  (*Id.* ¶ 49.)  Treatment notes from the first session on January 19, 2016 indicate that Plaintiff was in shackles at wrists and ankles with two prison guards present; he was alert and agreeable to physical therapy; he reported his pain was controlled; he was able to sit, stand, and support himself independently; he was given self-care training "within confines of 4 point restraints"; and the plan of care was physical therapy for "bed mobility transfer and gait training, standard hip precautions."  (Doc. 101-1 at 182−183.) Notes from his second physical therapy session the same day indicate that Plaintiff was "limited by ankle and wrist shackles"; was "alert and agreeable to [physical therapy]"; and had "[n]o reports of pain."  (*Id.* at 185−186.)  Notes from January 20, 2016, indicate that Plaintiff was progressing in bed mobility, transfer with device, and additional goals; he was instructed to "use walker at all times until cleared by surgeon, to "do [his] exercises 3−4 times/day," and gradually increase reps; the notes also state, "Activity tolerated well, Motivated, Increased gait distance, Improved function."  (*Id.* at 186.)  Notes from January 21, 2016 indicate the same and that Plaintiff was either progressing or had met his bed mobility, transfer with device, and ambulation goals.  (*Id.* at 186−187.)

On January 21, 2016, Plaintiff was discharged from Banner Baywood and was taken temporarily to ASPC-Tucson, where he was evaluated by medical staff and admitted to the infirmary.  (Doc. 1 ¶ 18; Doc. 101 ¶¶ 55−56.)  In the infirmary, Plaintiff was no longer kept

in restraints, and he suffered no lasting physical or mental effects from being kept in restraints during his hospital stay, though he found the experience of having to wear restraints while hospitalized unnecessary, "degrading," and "dehumaniz[ing]". (Doc. 101¶¶ 57, 61−62; Doc. 101-1, Ex. B (Pl. Dep.) 37:18−39:12.)  Plaintiff remained at ASPC-Tucson until February 9, 2016 and was then returned to ASPC-Lewis.  (Doc. 1 ¶ 18.)

Defendant Warden Moody does not recall receiving a request to modify Plaintiff's restraints while Plaintiff was at Banner Baywood from January 18−21 2016.  (Doc. 101-1, Ex. D (Moody Decl.) ¶ 10.)  A search of ASPC-Lewis records also did not reveal that any such forms were received from Banner Baywood during that time, though on October 9, 2017, a Dr. Pittman submitted a request on Plaintiff's behalf, seeking approval for removal of full restraints twice a day for therapy following knee surgery.  (*Id.* ¶¶ 12−13; Doc. 101-1 at 66.)  Moody also had no knowledge of Plaintiff's January 2016 hospitalization or the circumstances of his restraints at that time.  (Doc. 101-1, Ex. D (Moody Decl.) ¶ 14.)  And Moody did not have any involvement in developing ADCRR's mechanical restraint policy and does not train new COTA cadets or his subordinates on the use of restraints on prisoners while hospitalized.  (Doc. 101 ¶¶ 22−24.)

## C. Trinity Food Service at ASPC-Tucson

Trinity is a private entity, which has, since March 2012, been operating pursuant to a contract with ADC to provide food service to ADC/ADCRR.[4]  (Doc. 96 (Trinity and Shinn's Statement of Facts) ¶ 9; Doc. 101-7 (Donnelly Decl.) ¶ 1.)  Trinity, through its registered dieticians, developed the Standard Menu in accordance with ADC's specifications regarding daily caloric and nutrient requirements.  (Doc. 96 ¶ 10.)  The Standard Menu nutritional guideline states that the menu must provide "at least the Recommended Dietary Allowances for calories, protein, ten vitamins and six minerals as

---

[4] ADC did not use the full name ADCRR until 2020; therefore, much of Trinity's evidence regarding Trinity's contract and contractual obligations refers to ADC, not ADCRR.  For technical accuracy, the Court will refer to ADC when citing to this evidence; however, for practical purposes, ADC and ADCRR are the same entity.

stated by the Food and Nutrition Board, National Academy of Science-National Research Council, Revised 1989"; the Standard Menu meets these standards.  (*Id.* ¶ 11.)

Trinity's West Region Dietitian, Laura Donnelly, a licensed dietitian, is responsible for designing menus of nutritionally-adequate meals pursuant to the specifications of the correctional institutions, detention facilities, and other government agencies for which Trinity is contracted to provide food services throughout the Western Region of the United States, including ADC/ADCRR.   (Doc. 96-7 (Donnelly Decl.) ¶ 3.)  Donnelly developed the Standard Menu being served to Plaintiff at ASPC-Lewis.  (*Id.* ¶ 5.)  Donnelly attests that the Standard Menu "meets or exceeds the recommended nutritional standards specified by the Recommended Dietary Allowances from the National Academy of Sciences (1989), and ADC contract parameters" and is "nutritionally adequate."  (*Id.* ¶¶ 6−7.)

### D.   Plaintiff's Weight/Nutrition

From 2012 through the start of this action, Plaintiff, who is 6'1" tall, has had an average weight of 205 lbs.  (Doc. 96 (Trinity Defs' Statement of Facts) ¶ 1.)  According to a formula used on the U.S. Department of Health and Human Services (DHS) website, this height and weight combination equates to a body mass index (BMI) of 27.0, which is considered "overweight".  (*Id.* ¶ 2.)

In his 17 years of incarceration prior to his hip surgery in January 2016, Plaintiff was indigent and ate only or mostly the food provided to him in the ADC Standard Menu. (Doc. 1 ¶ 22.)  Blood tests taken in the hospital after his hip surgery and during his post-op care showed his body was lacking various essential vitamins and minerals, and medical staff stated that this was due to the long-term lack of essential micro-nutrients in his prison diet.  (*Id.*)  As a result, Plaintiff was prescribed supplements of several vitamins and minerals that could be metabolized and quickly absorbed on the balanced diet he was receiving in the hospital.  (*Id.*)  This diet consisted of meals that comported with the U.S. Department of Agriculture's (USDA's) and National Institute of Health's (NIH's) recommended nutritional guidelines.  (*Id.* ¶ 20.)  On days two through four of his hospital stay, Plaintiff ate four or five hospital meals a day, plus snacks.  (*Id.*)  During this time,

Plaintiff's blood was tested regularly, in part to determine if the nutritional supplements he was receiving were restoring the missing nutrients his body required for the surgical recovery process.  (*Id.* ¶ 21.)

After Plaintiff was released from Banner Baywood and taken to USPC-Tucson on January 21, 2016, he received only the food provided as part of the prison's regular diet, and he ate everything served to him in every one of those meals.  (*Id.* ¶ 27.)  Nursing staff monitored Plaintiff's weight daily, and Plaintiff lost approximately one pound of body weight per day, but his diet was never altered.  (*Id.* ¶ 28.)  When Plaintiff was discharged from Banner Baywood on January 21, 2016, he weighed 212 lbs., and when he was released from the ASPC-Tucson infirmary and returned to ASPC-Lewis on February 9, 2016, he weighed 195 pounds, for a total loss of 17 lbs. over 19 days.  (*Id.* ¶¶ 20, 28.)

Upon his return to ASPC-Lewis, Plaintiff was given a special needs order for meals in quarters and was provided the same meals that are served in the dining hall from Trinity's Standard Menu.  (*Id.* ¶ 29.)  Because Plaintiff was in a medium-security unit, he was not locked down and could obtain extra food items from various sources, including from non-incarcerated friends via ADCRR's "secure-pak" program, which allows prisoners to have food items sent to them through ADCRR's contracted vendor, Keefe Commission Network.  (*Id.* ¶ 30.)  With these extra foods and other leftover foods smuggled out of the kitchen, Plaintiff was able to stabilize his body weight and regain some of the weight he lost during his post-op recovery at ASPC-Tucson.  (*Id.* ¶ 31.)  But because these extra sources of food are unreliable, Plaintiff continues to lose 1−2 lbs. per week during times that he must eat solely from Trinity's Standard Menu.  (*Id.*)  Plaintiff also believes that, as discovered in the hospital, his long-term health was and continues to be adversely affected by the Standard Menu's lack of nutrients.  (*Id.*)  Plaintiff suffers from "inexplicable fatigue, lethargy, excessive bruising, slow healing of the skin, edema below the knees, and the sensation of being cold while inactive in a temperate environment."  (Doc. 1 at 20.)

Plaintiff's medical evaluation on September 8, 2017 noted that Plaintiff was "well developed well nourished," the section for "weight loss" was checked "no," and all other

observations were documented as unremarkable.  (*Id.* ¶ 5.)  Plaintiff's medical records from July 5, 2018, show he weighed 210 lbs., which equates to a BMI of 27.7 and is considered "overweight."  (*Id.* ¶ 3.)

**IV.    Defendants Ryan and Moody's Motion for Summary Judgment**

      **A.    Eighth Amendment Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from inhumane conditions of confinement.  *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain.  *Morgan*, 465 F.3d at 1045.  Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety.  *See Farmer*, 511 U.S. at 832; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982).

To state an Eighth Amendment conditions-of-confinement claim, a plaintiff must meet a two-part test.  First, the plaintiff must make an "objective" showing that the alleged deprivation is "sufficiently serious."  *Farmer*, 511 U.S. at 834.  To be sufficiently serious to form the basis of an Eighth Amendment violation, "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'"  *Id.* (citing *Rhodes*, 452 U.S. at 347).  Second, the plaintiff must make a "subjective" showing that the prison official acted with a "sufficiently culpable state of mind"; that is, that the defendant acted with deliberate indifference to the plaintiff's health or safety.  *Farmer*, 511 U.S. at 834.  To show deliberate indifference, the plaintiff must establish that the defendant knew of and disregarded an excessive risk to inmate health or safety.  *Id.* at 837.  To satisfy the knowledge component, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*  Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety.  *Id.* at 835.

1    Prison officials may avoid Eighth Amendment liability for the harm suffered by an
2    inmate if they show that: (1) "they did not know of the underlying facts indicating a
3    sufficiently substantial danger and that they were therefore unaware of a danger"; (2) "they
4    knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts
5    gave rise was insubstantial or nonexistent"; or (3) they responded reasonably to the risk.
6    *Id.* at 844.

7    **B.    Individual Capacity Claims**

8    A suit against a defendant in his or her individual capacity seeks to impose personal
9    liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). For a person
10   to be liable in his or her individual capacity, "[a] plaintiff must allege facts, not simply
11   conclusions, that show that the individual was personally involved in the deprivation of his
12   civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). There is no
13   respondeat superior liability under § 1983, and therefore, a defendant's position as the
14   supervisor of persons who allegedly violated Plaintiff's constitutional rights does not
15   impose liability. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978);
16   *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040,
17   1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits,
18   a plaintiff must plead that each Government official defendant, through the official's own
19   individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

20   Plaintiff's individual capacity claims against Defendants Ryan and Moody,
21   stemming from his alleged injuries from being restrained while recovering from surgery in
22   the hospital, fail as a matter law because the evidence either refutes or simply fails to
23   provide any support that either Defendant was personally aware of or involved in the
24   alleged constitutional deprivation. *See Nissan*, 210 F.3d at 1102 (summary judgment
25   movant must "either produce evidence negating an essential element of" the claim at issue
26   or show that the plaintiff does "not have enough evidence of an essential element to carry
27   [his] ultimate burden of persuasion at trial").

28

As to Defendant Ryan, Plaintiff alleges only that Ryan "promulgated D.O. 705, 'Inmate Transportation.'" (Doc. 1 ¶ 42.)  But there is no evidence that Ryan was personally involved in writing, initiating, or enforcing this policy.  More fundamentally, there is no evidence that Ryan was ever made personally aware that enforcement of it created a substantial risk of serious harm to Plaintiff and he deliberately disregarded that risk.  *See Farmer*, 511 U.S. at 837 (a prison official cannot be liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety").  Absent this element, Plaintiff's individual capacity claim against Ryan fails as a matter of law, and the Court will grant summary judgment to Ryan in his individual capacity.

As to Defendant Moody, Plaintiff merely alleges that Moody "encouraged and allowed the blanket application of four[-]point mechanical restraints on all medium custody inmates sans assessment of their individual escape/security risk and/or health needs." (Doc. 1 at 15.)  But Defendants have produced evidence that Moody was not involved in the development of ADCRR's restraint policies, did not train COs or his subordinates on the use of restraints during hospitalization, and had no involvement in or awareness of the application of ADCRR's restraint policy on Plaintiff during his hospital stay.  (Doc. 101 ¶¶ 22–25.)  Given this showing, and absent any evidence that would create a genuine issue of material fact that Moody was personally aware of and deliberately disregarded a substantial risk of serious harm to Plaintiff, Plaintiff's individual capacity claim against Moody also fails as a matter of law.  Accordingly, the Court will also grant summary judgment to Defendant Moody in his individual capacity.[5]

**C.    Official Capacity Claims**

To prevail on a claim against a public official in his official capacity or against a private entity serving a traditional public function, Plaintiff must meet the test articulated in *Monell*, 436 U.S. at 690-94 (1978); *see also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of state law).

---

[5] Because the Court will dismiss Plaintiff's individual capacity claims, it need not discuss Defendants' alternative argument that they are entitled to qualified immunity.

Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation. *Monell*, 436 U.S. at 694. To make this showing, he must demonstrate that (1) he was deprived of a constitutional right; (2) the public entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Further, because the State has Eleventh Amendment immunity to suits for damages in federal courts, a plaintiff may only sue a state official in his or her official capacity for injunctive relief. *See Will*, 491 U.S. at 71, n.10 ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n.14 (1985); *see also Flint v. Dennison*, 488 F.3d. 816, 825 (9th Cir. 2007) ("[A] suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity.").

As noted, to show a constitutional deprivation under the Eighth Amendment, Plaintiff must first be able to show that he was deprived of basic necessities, such as adequate shelter, food, sanitation, medical care, and personal health or safety, and that the alleged deprivation was objectively "sufficiently serious" to result in the denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 832, 834. (internal quotation marks and citations omitted).

Defendants argue that Plaintiff cannot satisfy this objective prong because the medical records during his hospital stay show that his restraints were repeatedly evaluated by medical staff to ensure that they were properly applied and not causing adverse effects; his extremities were checked to ensure good pulse, blood flow, and warmth; his restraints were regularly adjusted to prevent skin breakdown; and there is no evidence that Plaintiff sustained any lasting injuries from the restraints. (Doc. 100 at 9−10.) They further point to hospital notes that Plaintiff was able to eat, consume fluids, use the bathroom, and

maintain his personal hygiene; his physical therapy sessions were not adversely impacted by the restraints; and he was able to sleep during his hospitalization.  (*Id.* at 10.)

Based on the above, Defendants have met their initial burden of showing that the use of four-point restraints during Plaintiff's hospitalization was not objectively sufficiently serious enough to constitute an Eighth Amendment deprivation.  The evidence shows, for instance, that Plaintiff's "minimal civilized measure of life's necessities," such as eating, drinking, personal hygiene, medical care, and physical therapy to speed his recovery, were met.  The evidence also shows that, while Plaintiff's average nightly amount of sleep is unknown, Plaintiff was frequently asleep when checked on during nighttime and early morning hours, suggesting that he was able to achieve minimally sufficient amounts of sleep during his hospital stay.  Medical staff also regularly checked on Plaintiff and tended to his needs during daytime hours, including by checking his restraints for any adverse effects and adjusting them to prevent skin breakdown.  These facts demonstrate that Plaintiff did not suffer "the wanton and unnecessary infliction of pain" required to show an Eighth Amendment deprivation.  *Morgan*, 465 F.3d at 1045.  The Court must therefore turn to whether Plaintiff has produced sufficient evidence to create a genuine issue of material fact as to this showing.  *Anderson*, 477 U.S. at 248.

Plaintiff's general allegation that having to remain in four-point restraints while in the hospital "needlessly interfered with and inflicted pain" during eating, drinking, getting on and off the toilet, and during physical therapy sessions (Doc. 1 ¶ 25) fails to create a genuine issue of material fact that his basic needs, even though made more difficult by the restraints, were not met.  Plaintiff also fails to provide any more specific facts to establish the level of pain he experienced from having to complete these tasks while in restraints.  The undisputed evidence also shows that nursing staff regularly charted Plaintiff's meals, movements in and out of bed and to the bathroom, and they noted that he had "no issues" with meeting these needs.  (*See* Doc. 101-1 at 244−246.)  The hospital physical therapy providers also noted that, while Plaintiff was "limited by ankle and wrist shackles," he was "alert and agreeable to [physical therapy]" and had "[n]o reports of pain." (Doc. 101-1at

185−86.)  Their notes also indicate that Plaintiff was able to meet or progress toward his physical therapy goals.  (*Id.* at 186−87.)  On this record, a reasonable jury could not conclude in Plaintiff's favor that having to remain in restraints deprived him of the minimum civilized level of life's necessities.

Plaintiff makes additional assertions, however, that he experienced frequent, painful bouts of muscle cramping, obvious to anyone in the room; was unable to engage in necessary body movements to counteract or alleviate these lengthy periods of cramping due to the four-point restraints; and could only sleep for short periods of time due to the discomfort and severe restriction the restraints placed on his bodily movements.   (Doc. 1 ¶¶ 23−25.)  These allegations are specific and concerning enough to create a triable issue of fact that the use of four-point restraints during Plaintiff's hospital stay inflicted objectively serious pain and suffering.  *See McGuckin*, 974 F.2d at 1060 (pain and anguish suffered by prisoner constituted harm sufficient to support an Eighth Amendment action; "substantial" harm to the prisoner is not necessary") (internal quotations and citations omitted).   These allegations also constitute admissible evidence because Plaintiff has personal knowledge of his own injuries.  *See* Fed. R. Civ. P. 56(c)(4); *S. Cal. Housing Rights Ctr. v. Los Feliz Towers Homeowners Ass'n*, 426 F. Supp. 2d 1061, 1070 (C.D. Cal. 2005) (declarant has personal knowledge of her own symptoms); *see also Thomas v. Garcia*, 1:08-cv-00689-JLT (PC), 2013 WL 3773861, at *11 (E.D. Cal. July 17, 2013) (a party may testify as to what he felt when injured, how the injury affects him now and impacts his life, and any other information within his own personal knowledge based upon his own perceptions).

Because a reasonable jury, believing Plaintiff's testimony, could find in Plaintiff's favor on the objective prong of his Eighth Amendment claim based on Plaintiff's frequent and painful cramps while restrained, the Court must address whether Plaintiff can also meet the subjective prong, meaning whether he can show that prison officials were aware of and deliberately disregarded an excessive risk to his health or safety.  *Farmer*, 511 U.S. at 837.

Defendants argue that Plaintiff cannot make this showing as to Defendants Ryan and Moody because neither Ryan nor Moody had personal knowledge of Plaintiff's medical condition, of a need to modify his restraints, or of any requests to do so by medical personnel.  (Doc. 100 at 11.)

This argument is misplaced.  As discussed, Plaintiff has failed to state a claim against Defendants Ryan and Moody in their individual capacities.  This does not mean, though, that he cannot state a claim for declaratory or injunctive relief against these Defendants in their official capacities based on the policies and practices of the public entity—in this case, the State—for which these Defendants are responsible at ADCRR. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).  The proper question, then, is not whether Defendants Ryan and Moody personally violated Plaintiff's constitutional rights, but whether Plaintiff suffered a constitutional deprivation based on the actions of any ADCRR staff pursuant to the State's mechanical restraint policies.

Plaintiff alleges, and the Court takes as true, that over his four-day hospitalization, he made repeated requests of every team of CO IIs assigned to guard him for 8-hour shifts to modify his restraints, and each team refused to do so based on ADCRR's mechanical restraint policy.  Medical staff also made these requests of the CO IIs on Plaintiff's behalf, and the CO IIs also denied the requests of medical personnel on the same basis.  (Doc. 1 ¶¶ 23−15.)  The Court must therefore address whether a reasonable jury could conclude that the CO IIs or other ADCRR staff knew that the four-point restraints posed an excessive risk to Plaintiff's health and safety and were nonetheless deliberately indifferent to that risk, causing Plaintiff to suffer needless, objectively serious pain and suffering.

Defendants do not address the actions of the CO IIs assigned to guard Plaintiff in the hospital.  It is clear from DO 705, however, that four-point restraints are mandatory for medium custody prisoners such as Plaintiff, and the only exception is if a medical provider,

1   in consultation with the Warden, issues a medical special needs order, recommending
2   modifications.  (Doc. 101-1 at 125, 131.)   Under such circumstances, it would not be
3   deliberately indifferent for the CO IIs guarding Plaintiff to refuse to do something they
4   personally had no authority to do.   In the Eighth Amendment context, the Court must
5   consider whether the prison official "was in a position to take steps to avert the [harm], but
6   failed to do so intentionally or with deliberate indifference."  *Leer v. Murphy*, 844 F.2d
7   628, 633 (9th Cir. 1988).  That is not the case here where it is undisputed that the CO IIs
8   had no authority to comply with Plaintiff's requests.

9         The  CO  IIs'  policy-based  inability  to  grant  Plaintiff's  requests  for  restraint
10  modifications does not settle the deliberate indifference question, however.  A finding of
11  deliberate  indifference  may  still  attach  to  prison  officials  responsible  for  writing  or
12  implementing DO 705, if its mechanical restraint provisions—including the sections
13  allowing for restraint modifications—are "so deficient that the policy 'itself is a repudiation
14  of constitutional rights' and is 'the moving force of the constitutional violation.'"  *Hansen
15  v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted).  Nonetheless, that
16  showing is also not met here, where it is undisputed that DO 705 allows for modifications
17  to a prisoner's mechanical restraints when medical staff provide documented objective
18  medical findings supporting such modifications.  (Doc. 101-1 at 131 (DO 705.10 §§ 1.6.1
19  & 1.6.2).)  This includes that, in the hospital setting, medical staff must fax a Request for
20  Removal of Restraints form to the Warden or Deputy Warden for approval.  (*Id.*)

21        Here, there is no evidence medical staff determined any modification of Plaintiff's
22  four-point restraints, beyond those they could reasonably provide when checking for proper
23  blood flow, skin chafing, or other issues, was medically necessary or that any medical
24  provider ever faxed a request for modifications to the Warden or Deputy Warden, setting
25  forth objective medical findings for a reduction to one- or two-point restraints, as Plaintiff
26  requested.  Plaintiff alleges generally that "hospital staff" made such requests of the CO
27  IIs on Plaintiff's behalf, "based on their professional medical judgments."  (Doc. 1 at 6.)
28  But this statement is too vague about what hospital staff requested and what their medical

judgments were to create a genuine issue of material fact as to the medical record evidence Defendants have produced, showing that medical staff regularly checked Plaintiff's restraints and found no issues.  In short, there is simply no evidence that any medical provider attending to Plaintiff's post-surgery medical needs at Banner Baymont ever made objective findings that would have warranted restraint modifications.  Nor is it deliberately indifferent for ADCRR to require objective medical findings before modifying its four-point restraint requirement for medium custody prisoners such as Plaintiff.  *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.)

Because there is no evidence to support that any ADCRR personnel were both aware of and deliberately indifferent to any substantial risks to Plaintiff's health and safety caused by his four-point restraints or that ADCRR's mechanical restraint policy, which allows for modifications for demonstrated medical needs is, itself, so deficient as to constitute a constitutional violation, Plaintiff cannot show a constitutional violation, and his official capacity claims against Defendants Ryan (now Shinn) and Moody fail as a matter of law. Accordingly, the Court will grant summary judgment to Defendants on these claims and will dismiss these claims with prejudice.

**V.    Trinity and Shinn's Motion for Summary Judgment**

Here also, to prevail on a claim against Trinity as a private entity serving a traditional public function and against Shinn in his official capacity, Plaintiff must demonstrate that (1) he was deprived of a constitutional right; (2) Defendants had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe*, 237 F.3d at 1110-11.

As more fully set forth above, to show an Eighth Amendment deprivation, Plaintiff must show a "sufficiently serious" deprivation, such that he was denied the "minimal

civilized measure of life' s necessities." *Rhodes*, 452 U.S at 347.  He must also show that the deprivation resulted from deliberate indifference.  *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (citations omitted).

"Adequate food is a basic human need protected by the Eighth Amendment." *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996).  Prisoners must be provided food that is nutritionally adequate to maintain health.  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).  Therefore, a diet with insufficient calories for an extended period raises serious constitutional concerns.  *See Hutto v. Finney*, 437 U.S. 678, 683-84 (1978) (prison diet that consisted of just 1,000 calories a day may be tolerable for a few days but "intolerably cruel for weeks or months").

Trinity and Shinn (hereinafter "Defendants") argue that Plaintiff cannot meet the objective requirement of an Eighth Amendment claim because he "cannot demonstrate that he suffered an objectively, sufficiently serious injury that is attributable to a deficiency in the meals that he received or to any allegedly wrongful conduct by Defendants," and his alleged injuries are de minimis.  (Doc. 95 at 11.)

Defendants have minimally met their burden of showing that the Standard Menu provided to ASPC-Lewis prisoners, including Plaintiff, is nutritionally adequate to maintain health.  Trinity Dietitian Laura Donnelly attests that she developed the Standard Menu and that it "meets or exceeds the recommended nutritional standards specified by the Recommended Dietary Allowances from the National Academy of Sciences (1989), and ADC contract parameters" and is "nutritionally adequate."  (Doc. 101-7 (Donnelly Decl.) ¶¶ 6−7.)[6]   More specifically, the menu provides "at least the Recommended Dietary

---

[6] Although this evidence is in Defendants' Statement of Facts, Defendants fail to provide a single citation to evidence in the argument section of their Motion or to incorporate the relevant evidence into their arguments.  (*See* Doc. 95 at 10−17.) Defendants are reminded that they have an obligation under Federal Rule of Civil Procedure 56(c)(1)(A) and Local Rule 56.1(1)(a), to "cite to the specific admissible portion of the record where the [relevant] fact finds support."  *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003) (in summary judgment briefing "[g]eneral references without page or line numbers are not sufficiently specific"); *see also Orr v. Bank*

1   Allowances for calories, protein, ten vitamins and six minerals as stated by the Food and

2   Nutrition Board, National Academy of Science-National Research Council." (Doc. 96

3   ¶ 11.)  As a licensed dietician and the creator of the Standard Menu, Donnelly is qualified

4   to make this determination, and these facts show that the Standard Menu meets the

5   "minimal civilized measure of life' s necessities." *Rhodes*, 452 U.S at 347.

6       Defendants also produce facts showing that Plaintiff's reported average weight from

7   2012 through the start of this action was 205 pounds, and that, based on Plaintiff's height

8   of 6'1," this is not underweight, but according to information publicly available online

9   from the DHS, falls within the "overweight" parameters.  (Doc. 96 ¶ 2.)  Defendants also

10  point out that there is no evidence showing that Plaintiff's various medical complaints,

11  including "inexplicable fatigue, lethargy, excessive bruising, slow healing of the skin,

12  edema below the knees, and the sensation of being cold while inactive in a temperate

13  environment" (*see* Doc. 1 at 20), are attributable to a lack of nutrition.  (Doc. 95 ¶ 12.)

14      In light of these showings, Plaintiff fails to produce sufficient evidence to create a

15  genuine issue of material fact that the Standard Menu is nutritionally deficient or is the

16  cause of any serious health issues.  Plaintiff relies, in part, on blood tests he had taken in

17  the hospital, which he alleges showed his body was "lacking various essential vitamins and

18  minerals," and the opinions of hospital "medical staff," who told him these deficiencies

19  were "the result of a long term lack of [vitamins and minerals] in sufficient amounts in

20  [his] prison diet."  (Doc. 1 ¶ 22.)  Absent more specific facts regarding Plaintiff's blood

21  test results and what, if anything, medical staff specifically diagnosed, there is no way to

22  determine, however, that these assertions were based on medical evidence and not merely

23  speculative.  *See Ploof v. Ryan*, No. CV1300946 PHX-DGC (JZB), 2016 WL 393583, at

24  *14 (D. Ariz. Feb. 2, 2016), *aff'd*, 689 F. App'x 522 (9th Cir. 2017).  ("Although Plaintiff

25  shows that he does not consider the [prison diet] adequate, he has not produced any

26  evidence from any doctor showing that any doctor believes that the diet . . . is inadequate .

27

28  ───────────────

    *of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need
    not paw over the files without assistance from the parties.").

. . . Under these circumstances, an Eighth Amendment claim cannot lie").   Plaintiff's statements that he received prescribed vitamin and mineral supplements and had his blood tested regularly in the hospital to ensure his body restored the missing nutrients required for recovery are also too general to show that, absent the unique circumstances of hip surgery, these supplements were required for Plaintiff to maintain adequate health.

Plaintiff's complaints of rapid weight loss after leaving the hospital, where he claims he ate four to five meals a day plus snacks and received dietary supplements, also do not create a genuine issue of material fact that the Standard Menu fails to provide adequate nutrition.  There is no medical evidence showing that Plaintiff was ever underweight.  Nor is there any competent medical evidence showing that Plaintiff's various other complaints, such as fatigue, lethargy, and edema below the knees are causally connected to inadequate nutrition.[7]

Because Defendants have shown that the Standard Menu served at ASPC-Lewis is adequate to maintain health by 1989 national nutrition standards and does not deprive Plaintiff of necessary calories or nutrients, and Plaintiff fails to create a genuine issue of material fact that the diet is inadequate and deprives him of the minimal civilized measure of life's necessities, Plaintiff's Eighth Amendment claims based on his prison diet fail as a matter of law.  Accordingly, the Court will grant summary judgment to Defendants Trinity and Shinn on these claims and dismiss these claims and Defendant Trinity from this action with prejudice.

. . . .

---

[7] Plaintiff makes other allegations in his Complaint that Defendants' dietary policies "are more honored in breach than observance" because Defendants incentivize the "white shirts" and kitchen staff responsible for ordering and preparing meals to cut costs in lieu of ensuring that prisoners receive adequate nutrition; as a result, the foods required to make the Standard Menu nutritious are often swapped out for cheap, inadequate substitutes that are high in bad fats, sodium, simple starches, and sugars.  (Doc. 1 ¶¶ 32−36.)  Because Plaintiff does not demonstrate personal knowledge of these facts, and he has not timely produced any evidence to support them, these allegations fail to create a genuine issue of material fact that Defendants' Standard Menu is, in practice, nutritionally deficient.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants Ryan and Moody's Motion for Summary Judgment (Doc. 100) and Defendants Trinity and Shinn's Motion for Summary Judgment (Doc. 95), and the Motions are **granted**.

(2)     This action is **dismissed with prejudice**; the Clerk of Court is directed to **enter judgment** accordingly.

Dated this 22nd day of February, 2021.

James A. Teilborg
Senior United States District Judge